The next case on the docket is 5-13-363, City of Belleville v. Bethany Place. You are to proceed. My name is Mark Peebles, I represent Bethany Place. We are here today because Bethany Place was determined that a needle exchange could not be operated pursuant to a special use permit which was issued by the City of Belleville back in 1998. Specifically, there was a special use that was approved pursuant to application granting my client Bethany Place to operate a small community residence with five beds and office space at 821 West A Street in Belleville, Illinois. With the following exception that there be exterior lighting on A Street in Belleville. 821 what street? 821 West A. Yes. And that the lighting on A Street be approved. Up until that point in time, at that point in time and subsequent to that point in time, Bethany Place provided the most comprehensive AIDS service and prevention for AIDS and HIV in the Belleville community. Throughout that time, through education and in prevention, Bethany Place's purpose was to stem the tide to stop the spread of HIV and AIDS. And if you analyze that, what exactly does an AIDS service organization such as Bethany Place do in order to stop the spread of that disease? Well, for one thing, they would distribute condoms because unprotected sex is one way of that disease being spread throughout the community. So Bethany Place, throughout its inception, has distributed condoms. They've also looked at intravenous drug use as another type of spread of that disease. And intravenous drug users oftentimes would use the same syringe over and over and those syringes would become contaminated and lead to the spread of disease. Since Bethany Place has been in operation in Belleville for nearly 20 years, the spread of HIV and AIDS has gone down significantly. And a major portion of that service has always been providing needles, clean needles. Bethany Place had been affiliated with St. Elizabeth's Hospital in Belleville for some time. Since then, they have moved on to their own facility, the Illinois Department of Health. The Illinois Public Health Association, those public bodies provide Bethany Place with the materials such as syringes and saline that Bethany Place then combines at their location in Belleville, or up until the order in this case was entered. And they would distribute these items. The sole purpose was to stop the spread of AIDS and HIV, and consistent with that, hepatitis C and other blood-borne diseases could be stopped. But what is, if we, I haven't even examined the record yet. Will the record show what the variants said exactly, and what the zoning was in the area? Yes, the ordinance itself indicates that the area where Bethany Place was located was a light industry district. It includes permitted uses at section 60-6-73. Included in that, manufacture, compounding, processing, packing, or treatment of such products as candy, cosmetics, drugs, perfumes, and pharmaceuticals. Would be our position. There's nothing about so many beds or housing, is there? Well, that is the special use portion of the ordinance. That's what I, yeah, okay. In the special use portion of the ordinance, there are several special uses enumerated. One of those is a small community residence, which was what Bethany Place had applied for initially, for five beds and office space. So is the variance specific in the number of beds, et cetera? Yes. And what they can do? The variance that was granted states that there will be five beds and office space. It would be at common law record, page 18. Well, I was just wondering, maybe, are they in violation even of it being a condom distributor? Well, that's where I would go back to the original. Which, of course, it might not make any difference now because you can buy it at any store. Right. Which is different, maybe, than when they got this variance. Well, I think that at the time that the use variance was applied for, they were in a different location. And they were still providing all the same services that they continue to provide when they move to the new location. Was it the same zoning? Well, I think the zoning may have even been less restrictive at their prior location. The location they moved to is a light industry district, which is pretty permissive. There are quite a few uses that are provided in the light industry. So the services that they provided never changed except for the fact that they needed five beds. And that was not provided for in the regular uses or the permitted uses in the light industry district. So the application for the special use was for the five beds. All the other services that they had provided prior to that application, at the time of the application, and subsequent to the application, remained the same. They still provided syringes. They still provided condoms. All those prevention and education types. Were those provided for the five beds only, or there was a walk-in crowd? I think prior to the five beds, that was provided to anyone who needed it. Before the five beds, there was no residential component for Bethany Place. When they expanded, it was determined that they could better serve their population because some of the HIV and AIDS sufferers were homeless. And if they provided some transitional housing for them, they'd have a place to get started and then move on to some more substantial or permanent housing. But the services that were provided prior to that really didn't change. And there's some mention in the record of the needle exchange beginning in 2009. I think that it was named the needle exchange, or that needle exchange was referred to in 2009. And the primary reason for that was a huge spike in intravenous drug use. There's been an epidemic. Of course, they might have had an action back then. I don't know. I don't know. Up until 2013, the city of Belleville had never said anything about a special use request or application for a needle exchange or for any other service that Bethany Place provided. They continued to provide their services. And when they did receive a letter from the city of Belleville asking them to apply for a special use for a needle exchange, a review of the ordinance shows that that's not even listed as a special use. Are there any other programs in the city other than that? Specifically for… To do needle exchanges? Hospitals. Hospitals? CVS Pharmacy. Walgreens Pharmacies. There, besides intravenous drug users, there are diabetics that use syringes as well. And they could go to any of those facilities and exchange the dirty needles for clean ones. Really, it's not focused just on intravenous drug users. It's just making sure that there are clean needles out there to stop the spread of disease. Let's see what I was trying to figure out. What kicked this off? Were there discarded needles found in the area that caused this to happen? I'm really not sure, Your Honor. I don't know why suddenly it became urgent after all those years. Because those same services had been provided throughout that whole period of time. Suddenly, there was a letter. I don't know if a resident became upset or if there were needles. I really don't know. It's not in the record anyhow. There's nothing in there. No. No. And at the time that this specialty use was granted, the mayor of the city of Belleville had written a letter in support of the application and referred to Bethany Place as the community's most comprehensive AIDS service organization serving the Belleville area. Now, in order to be a comprehensive AIDS service organization to stop the spread of AIDS and HIV, we look at unprotected sex and dirty needles used by intravenous drug users or whoever who would be infected. So the way to stop that spread of the disease is exactly what Bethany Place has dedicated itself to doing, providing clean needles. And they also provided a safe way of disposing of dirty needles. There were sharps containers that were also handed out at the same time so that if someone came in with a needle that was dangerous or dirty, they could put it in a container that could be safely disposed of and not threaten the spread of any disease to anyone. And those clean needles, those were also provided so that anyone who was infected wouldn't spread the disease to someone else. There would be a clean needle. So that was contemplated as far back as 1998. And when Bethany Place received this letter in support of the application, they felt like they could rely on that and had, in fact, relied on that for all these years up until 2013 when there was another letter sent out requesting them to apply for a special use for the needle exchange. But I really, if... And that letter was from the mayor's office or where? I believe it was from the city attorney's office. And that may not be relevant to this case, but was that done? Was there a special use application then made pursuant to that letter of direction? No. What my client did was review the ordinance to determine if there was a special use that was identified or described. And there's nothing in the special use section that refers to a needle exchange. They've always relied on the section in permitted uses that refers to the manufacturing, compounding, processing, packing, or treatment of such products as candy, cosmetics, drugs, perfumes, pharmaceuticals, toiletries, specifically pharmaceuticals, because to be a comprehensive AIDS service organization, there are certain pharmaceuticals such as syringes that are very important to stopping the spread of AIDS and HIV. So they've always felt that they could rely on that, and up until 2013 they had. And under that provision, I take it you would agree that neither of you were able to cite a case directly on point that says a needle exchange program falls within this wording in a zoning ordinance. No, I've never seen a case that actually says that. And did you look at it in other jurisdictions other than the state of Illinois? Yeah, I did not see anything. And I think the reason why is that this light industry district is so broad. There's so many uses that are provided for in that district that it's more inclusive than exclusive as far as being able to provide that type of service, especially when Bethany Place has always relied on the fact that they are referred to as the area's most comprehensive AIDS service organization. If they were not allowed to provide clean syringes or to provide condoms or to provide education or to provide counseling, if they had to apply for special use for each one of those things, they really wouldn't be providing much service. Up until that point, they thought that what they were doing complied with the zoning ordinance and that relied on the letter from the mayor and the fact that the special use that was granted was just for the five beds and not for anything else. There was no urgency. There was no reference to any application for a special use just for a needle exchange or for condom distribution or for any of the services that they provided. It was just they went to this light industry district doing the same services they've always provided, all the preventive services. But the only thing that was different were the five beds for the transitional housing. So they did apply for that, and it was unanimously approved. And they've just continued since then to provide the same services that they always have. The only thing I can think is that maybe because heroin use has increased so much throughout our entire area that maybe there were more syringes. That's the only thing I can think of. But thank God they were able to stop the spread of disease. What's more important? Certainly, we don't want people contracting these diseases that are potentially fatal. If there's an organization there that can help stop that. They've always felt that they could rely on that letter from the mayor, indicating that there was some approval for what they were doing. That they continue to receive these raw materials from the state in order to continue their purpose for stopping the spread of disease. And nothing had changed up until 2013 when this lawsuit was filed. The legal exchange in Chicago, is that okay? Yeah, I've not heard any reason that that's not accepted and is allowed to operate without any limitation. I have been contacted by other aid service organizations who provide the same types of services who were kind of surprised that this came about. So, I don't know if it's a matter of first impression or- Sounds like it does. It might be, because I haven't seen anything similar to it. I do refer in my brief to an equitable estoppel argument. If the panel would look at this and determine that in fact there is some requirement, we'd also argue that so much time has passed and that my client has detrimentally relied upon this letter from the mayor and continued to provide these services to the community, that the city should be estopped now from stopping. Will the record reflect what the usage is? How many meals have been exchanged in the past pursuant to the letter? I don't think so. It's not in the record? The record is really sparse. There was a motion for judgment on the pleadings that was filed very early on. There's very little in the way of evidence that was adduced at the hearing. We have the ordinance. We have the zoning ordinance. We have the ordinance that approves the special use. And then we have the record of the hearings. There's really not much more. There was no testimony. There was just argument from counsel. Well, I was just wondering, would your estoppel be based on the reliance upon the letter, but does the mayor have the power to issue the letter? And would she have an estoppel based? I don't know. I think that the case that I cited referred to a county board chairman or a county commissioner who issued a decision regarding an asphalt plan. Continue on. And the county was bound by that. But many more years passed. I think we're looking at several decades, maybe 30. Well, you're looking at different mayors, maybe, and executive versus judicial. Right. Legislative, I mean. Right. Thank you, counsel. Thank you. Thank you. May it please the court. Counsel. My name is Garrett Warner. I'm the city attorney for the city of Belleville. And I think I would like to begin my argument with the procedural posture that counsel touched on near the end, because it really will show that much of the facts that counsel has alleged during the course of the argument are both not in the record, nor really relevant to the analysis that we're here upon today. The circuit court of St. Clair County granted a motion for judgment on the pleadings under Section 2-615E, which is similar to summary judgment, except that you look at the pleadings alone, judicial admissions, and items that this court can take judicial notice of, in order to determine whether or not there are any genuine issues of material fact and whether or not one party is entitled to judgment as a matter of law. And similarly, your review is de novo, and of course you can affirm for any reason in the record. But I think procedurally, when you look at the confines of this matter, we look not to what counsel has talked about during his argument, but really we look to the allegations in the pleadings and the ordinances of which you can take judicial notice. And I can tell you that during, inheriting this case at the motion to reconsider stage, when I became the city attorney, I found that this case involves a moving target as to the position of the defendants in this case. Initially, within the pleadings, in the answer affirmative offenses and the counterclaim that was filed by the appellate, they were taking the position that the needleless exchange program was allowed under the 1998 ordinance that granted the use variance for the small community residence. And I think it's important to look at the facts that's really the salient facts in this case, and there really are only a few for purposes of this evaluation. And that is that back in June 5th, on or about June 15th, 1998, there was an ordinance passed by the city council that granted a use variance for, quote, a small community residence with five beds, period. It had single stipulation related to improvement of lighting. It said nothing about a needle exchange program. And, in fact, if you look at the allegations of the affirmative defenses, the pleadings that were filed by the appellant itself, it acknowledges that it didn't begin utilizing the needle exchange program until 2009, over 10 years later. So when council suggests that there isn't much service for them to provide to HIV and AIDS patients, that can't be true because they didn't do the needle exchange program for the first 11 years that they were in operation under this use variance. So what happened is, in 2013, the city files this enforcement action because the city discovers through neighbor resident complaints that there are needles there, that debris in the area, and they discover they're operating the needle exchange program. So they file the complaint. The answer in the affirmative defenses in the counterclaim suggests that it is permissible under the ordinance that granted the 1998 use variance. The court enters an order, judgment on the pleadings in favor of the city, on the basis that it's not. It's not a permitted use. It's not permitted under the special use permit. In fact, there is no variance or special use permit that allows this operation, and that they are forbidden from operating this needle exchange program unless and until they see the permit and it's granted. Essentially, the crux of this case is the city council hasn't determined whether or not this use is permissible. It wasn't given the opportunity. So we fast forward to the motion to reconsider. The motion to reconsider is filed, and it raises arguments that aren't contained in the pleadings. The position in the motion to reconsider raises for the first time that the operation of the needle exchange program is a permitted use in a live industry district under the city zoning code, in particular the provisions that apply to the manufacture of pharmaceuticals and industrial use. Giving needles to people in exchange for dirty needles, I think common sense dictates that's not a pharmaceutical manufacturing industrial use. And I think what's important in this, well, let me address the second argument as well. Defendant is stopped from taking action to stop defendant's needle exchange program. But before I get to the substance, I want to address procedurally the importance of the fact that these arguments were not raised until the motion to reconsider. I think that the law is clear that arguments that are raised the first time in the motion to reconsider are waived. In this case, they're really not even relevant because they're not raised in the pleadings. They're not referenced in any manner in the pleadings. So there's really no facts upon which to address a motion for judgment on the pleadings that would support those positions. So I think that's another issue with it. But nevertheless, they would be waived. Now, understanding that waiver is a limitation of the parties and not the courts, my brief goes on to, nevertheless, alternatively address the substantive allegations that were raised the first time on the motion to reconsider. Now, first, with respect to the allegation that a needle exchange program is a permitted use, section in all the relevant ordinances of which you can take judicial notice are contained in the supplementary appendix that's attached to the plaintiff's brief. But it has to be a permitted use under section 60-6-73 or a special use under 60-6-74, which requires a special use permit. If it's not expressly listed in either one of those places in the ordinance, then section 60-3-7 says that unlisted items, matters that are expressly unlisted, or I'm sorry, not expressly listed, are prohibited unless the city council grants a use variance, which is essentially an amendment, an isolated amendment to its code to allow that use. And again, that hasn't been determined because there has never been an application for it. But all the city has done in its enforcement action is ask the, and council indicated, that they asked them to submit an application because that's the proper procedure. No city can let, for purposes of zoning, its residents just go and determine on their own whether or not a use is permitted or special or should be granted. If it's not, that's what the city invited them to do, and they didn't do it. So where we're at on the analysis of their substantive issues is that this court has long held that it's axiomatic in the interpretation of statutes and ordinances that courts should avoid absurd results and legislative enactments should be interpreted in a common sense manner according to the perceived intent of the drafting authority and in the context of the whole enactment. What council is suggesting on behalf of this client is that this needle exchange program is tantamount to the distribution, I'm sorry, it's tantamount to the processing, packing, or treatment of pharmaceuticals. Essentially the manufacture of pharmaceuticals, yet they acknowledge in their brief that they're merely distributing syringes, needles, saline, and other items including sharps containers. That's not manufacturing pharmaceuticals. That's not an industrial use. I think on its face, there's no evidence in the record that suggests that the defendant's operation of a needle exchange program falls within that definition. But looking at the zoning code as a whole, understanding that we have to look at the context of the entire code, it's important to know the special use that they were granted in 1998 was for a small community residence. And I noted in the brief that the definition of community residence and the definition of small community residence expressly prohibit use by substance abusers. Now, obviously, if substance abuse is expressly prohibited in the use for which they requested and were granted, then drug paraphernalia would be necessarily prohibited unless there is some legislative enactment by the city council, by ordinance, by use variance, whatever it may be, to permit that use. The use that he's seeking to argue here is inconsistent. It's not covered by the 1998 enactment, the 1998 use variance. It's actually inconsistent with it. So it's the position of the city that the fact remains that the defendant's use of the property is limited to residential for a few, up to five. It's not for a drug-related service for the general public. Entirely different use is what's being proposed. And again, it operated for 11 years, admittedly, without having an exchange program. It operated for 15 years before the city became aware of it, and that's when the city took the action to enforce its zoning ordinance. Now, there's also an argument that the plaintiff, the city, has stopped from taking enforcement action based upon this letter that was attached to the motion to reconsider from the former mayor. And I think there's many important points to address in relation to that argument, the first of which is, while it's a matter of record, it's not a matter of pleading. There's no reference in the pleadings about that. It wasn't raised until the motion to reconsider. And so, procedurally, it's really not proper to consider it. It's either been made, or nevertheless, it wouldn't be relevant to a consideration of pleadings. But if you look at the content of it, that's even more telling, because that letter was dated June 4, 1998. Eleven years before the needle exchange program was admittedly begun based upon the allegations of the pleadings. So, neither party, obviously, at the time of that letter, contemplated a needle exchange program. In fact, the only reference in the letter by Mayor Kern at that time was to transitional housing. It said the word housing seven times. It never said needle exchange program. And I think that's telling. But even more so, looking at the law that applies, and in particular the case of County of DuPage v. K-5 Construction Corporation that's cited by the defendant, McClellan, it's important to look at the narrow circumstances under which you could even apply equitable estoppel to a municipality. In that case, it talked about an affirmative act inducing justifiable reliance on the part of the claimant and then actual reliance in a change in substantial position. And it goes on to explain that equitable estoppel as applied to a municipality is not favorable and will lie only in extraordinary or compelling circumstances. And the affirmative act must be an act of the municipality itself, such as legislation, rather than an unauthorized act of a ministerial officer. And so there's a question in this case, they determined in the affirmative, that the zoning administrator did have the ability to issue an opinion that, and the opinion was as to the legality of the specific asphalt operation that they were doing, and they found that he was so authorized. There is no evidence in the record to suggest that the mayor had rendered an opinion about the legality of an eagle exchange program that did not begin for 11 years after the letter, or that he was even authorized to render opinions related to the zoning code. That would be a function of the zoning official under the ordinances that you take judicial notice of. So in this case, there is no affirmative act by the city inducing justifiable reliance on the defendant's part, upon which the defendant acted, because nothing had happened yet. They operated again for 11 years. So essentially, what this case boils down to is based on the pleadings. In 1998, the city approved a small community residence for five beds, as defined in two places in the code. It contemplated transitional housing, and that is all contemplated. 11 years later, the defendant expanded that use without the city's knowledge to providing eagle exchange services to the general public, which is contrary to the zoning code. Therefore, the city took enforcement action and said that you must have a use variance because this is neither permitted or special use under the zoning code. And so the circuit court properly granted judgment on the pleadings on that basis. They said it's neither a permitted use or a special use, and that they are prohibited from operating until such time as a permit is issued. And I believe that based on the facts of the law in this case and based on the pleadings, that that was the proper ruling to make, and they should have to go through the process like everybody else who wants to have a use that's not expressly provided within the code. Treat them like every other resident. Give the city council an opportunity to weigh in all these facts and consider all these things that council has talked about during this argument. That's proper in front of the city council and make a determination. And then if there's a result after that that they think is unfair, then that's when they would seek redress in the court system. So for those reasons, I would ask that this court affirm the judgment on the pleadings that was entered by the St. Clair County Circuit Court, and I would be happy to answer any questions that you may have. I have no questions. Thank you, counsel.  Rebut. Thank you, Your Honor. Counsel makes reference to the fact that needle exchange and other services that were provided by Bethany Place were not raised until the motion to reconsider in this matter. However, review of the record, Common Law, page 11, of the counterclaim that was filed in this matter, clearly states that since the ordinance was passed, referring to the June 15, 1998, ordinance granting the use variance, defendant-counterplaintiff has operated the small community residence and has provided HIV-preventive services to the public and services to HIV clients and their families, including but not limited to condom distribution and needle exchange. Now, maybe semantics, but up until 2009, perhaps a more descriptive way to refer to the syringes would be a distribution instead of an exchange. I don't know that there is any evidence in the record that there was an exchange prior to 2009, but certainly providing clean syringes has always been a part of the services that have been provided by Bethany Place. In 2009, there was such a spike in the number of syringes and the number of users of syringes that an exchange was created in order that dirty needles would be brought in and put in sharps containers and taken off the street and not just discarded on the sidewalk, and that those dirty needles were brought in and clean ones were exchanged for those. But that doesn't change the fact that prior to that,  As far as the equitable estoppel, I guess that's up to the court to determine whether or not Bethany Place can rely on a letter written by the mayor of the city of Melville in support of their application  I would agree with counsel that this record is pretty sparse, that there was very little evidence adduced prior to the decision being made, but based on what we have in front of us, looking at the ordinances and interpreting the ordinances by the clear language that they're written in, Bethany Place has always operated legally up until 2014. Well, how many times do you hear, let's make a good record? Yeah. And on this waiver issue, let me ask you this. Your two main arguments here, one is it's a pharmaceutical and the other is the estoppel by the mayor's letter, and you just made reference to language in your counterclaim, I guess it was. Yes. Was there a written response filed to the motion to dismiss? I didn't see where that's in the appendix, so I'm assuming there was not a written response to the city's motion to dismiss to counter the points made. And my other question is, was there a record made of the oral argument on the motion to dismiss? And is there a transcript of that included in the record? I don't recall that. I think the only record that we have was there was a record on the motion for judgment on the pleadings that was filed by the city. Okay, there was a transcript of that hearing? Yes. Okay. Well, that's what I was asking. There is a record on that and then a record on the motion to reconsider. Okay. Thank you, counsel. Thank you. If you're excused, we'll dig into your advisement. Thank you.